1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL KEY, JR.,                      )
                                        )
            Petitioner,                )        No. C 06-4199 CRB (PR)
                                        )
      vs.                               )        ORDER DENYING PETITION
                                        )        FOR A WRIT OF HABEAS
J. WALKER, Warden,                     )        CORPUS
                                        )
            Respondent.                )
_____ )

      Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254.  For the

reasons set forth below, the petition is denied.

                          **STATEMENT OF THE CASE**

      After a jury trial in the Superior Court of the State of California in and for

the County of Alameda, petitioner was found guilty of multiple offenses: one

count of first degree murder, three counts of attempted murder, one count of

carjacking, one count of second degree robbery, and two counts of possession of

a firearm by a felon.  On December 1, 2002, the trial court sentenced petitioner to

an indeterminate term of 114 years to life, plus a determinate term of 33 years.

      Petitioner filed a notice of appeal on January 13, 2003.  On April 25, 2005,

the California Court of Appeal, First Appellate District, reduced two restitution

fines, struck the terms imposed on three of the counts, stayed the term imposed

on the robbery count, and otherwise affirmed the judgment of the trial court.  On July 27, 2005, the Supreme Court of California denied review.

On July 6, 2006, petitioner filed a petition for writ of habeas corpus in the Superior Court of the State of California in and for the County of Alameda.  On July 20, 2006, the court denied the petition.

On August 11, 2006, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, First Appellate District.  On April 11, 2007, the court denied the petition.

On September 28, 2006, petitioner filed a petition for writ of habeas corpus in the Supreme Court of California.  On April 11, 2007, the court denied the petition.

On July 7, 2006, petitioner filed the instant federal petition in this court.  Per orders filed on December 4, 2006 and May 17, 2007, the court granted his requests for a stay to permit him to exhaust additional claims in the state courts and advised him that, within 30 days of his exhausting the claims in the state high court, he must move to reopen the case, lift the court's stay and amend the stayed petition to add the newly exhausted claims.

On June 11, 2007, petitioner filed a petition for writ of habeas corpus in the Superior Court of the State of California in and for the County of Alameda.  On June 11, 2007, the court denied the petition.

On June 22, 2007, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, First Appellate District.  On June 25, 2007, the court denied the petition.

On July 10, 2007, petitioner filed a petition for writ of habeas corpus in the Supreme Court of California.  On January 3, 2008, the court denied the petition.

On February 1, 2008, petitioner returned to federal court and moved to reopen the case, lift the court's stay and file a first amended petition containing all of his claims. He alleged that his final state petition was denied by the state high court on January 3, 2008. The motion was granted and the first amended petition ordered filed.

Per order filed on July 21, 2008, the court found that the petition contained cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer on November 3, 2008. Petitioner filed a traverse on January 14, 2009.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> The charges against [petitioner] arose from two separate incidents. The first incident involved the murder of Dorman Lemon and the attempted murders of Dwayne Washington and Keith T. on March 15, 2001. The second incident involved the robbery, carjacking, and attempted murder of Curtis Luckey on March 30, 2001.
>
> Prosecution Case
>
> March 15, 2001 Incident Involving Lemon, Washington, and Keith T.
>
> On the evening of March 15, 2001, Dwayne Washington met up with his old friend, Dorman Lemon, known to Washington as "Turtle" or "Jabari," at 83rd and Dowling Streets in Oakland. They drove around for a while in Lemon's car, a "dark primer" colored Malibu. After getting some food at Taco Bell and stopping at Lemon's house, they parked again on 83rd and Bancroft. Lemon got out of the car and went to the side of a building across the street, where he might have "put something up," i.e., stashed some drugs. Someone briefly came up and talked to Lemon, and then left.
>
> About five minutes after Lemon left the car, Washington heard his friend, Keith T., talking as he walked up to the car. Keith T. was about 16 years old at the time. Keith T., who came from the direction of his nearby house, got in the car and sat in the driver's seat. It was between 9:00 p.m. and 10:00 p.m. While Washington and Keith T. were talking, a few young guys in a little red car drove up and asked if

3

their car was for sale. Washington directed them across the street to Lemon, who said he would sell it for $ 1,800. The car then left. Earlier, two "youngsters" had walked up and asked Washington about the car.

Then, as Lemon walked back toward the car, Washington saw someone come from around the corner on foot. He was wearing a gray hood, brown pants, and maybe something blue, and his attention was on Lemon. As Lemon came toward the car, the man also came toward the car. The man seemed to be about the same height and build as Lemon. He stopped by the driver's side door next to Lemon. Washington told the man he had seen him the other day, and asked why he had not said anything. The man bent down and lifted his hood up, as if asking, "Do you know me?" The man's attitude was calm, cool. Washington, who could see the man's face clearly, recognized him. He had given Washington a ride in a white car about six months earlier. He had also seen the man in a brown BMW a few days before March 15, 2001. He asked the man why he had not said anything to him because he sensed something was not right in how the man walked up with his hand in the pocket of his hooded sweater, against his belly, and he wanted to tell the man to leave him out of whatever he was about to do. Washington was also worried because of "stuff" going on on the block over drugs; he knew there was bad blood between Lemon and a man named Derrick Cummins ("Heavy D"). Washington identified [petitioner] at trial as the man he saw that night with the hood on.

[Petitioner] asked Washington and Keith T., who were sharing a cigarette, "Can I hit this cigarette?" Keith T. refused, but Washington said to give it to him. Keith T. handed [petitioner] the cigarette and he took a few hits. He then dropped the cigarette and Washington saw his arm go straight out in front of him and Washington heard a gunshot and saw the flash of a bullet. Washington did not hear any other words spoken before the gunshot. Washington then saw the gun point into the car and [petitioner] started shooting into the car. The gun sounded like a revolver and it went off four or five times in the car. Washington was shot three times: twice in the left arm and once in the leg. Keith T. was screaming and trying to cover up. Washington did not see Lemon with a gun that night, and [petitioner] was the only one shooting.

After the shooting, Washington opened the door and saw [petitioner] running away, but looking back at the car. Washington got out of the car and ran along Bancroft to 81st. Keith T. also got out of the car and ran back toward his house. Washington called the paramedics from a house on 81st Street. The police arrived first, and initially thought Washington was the shooter. Washington was a bit uncooperative with the paramedics because the police were surrounding him and asking questions. Washington had ingested some powder cocaine about an hour before the shooting, but was not feeling its effects at the time of the shooting.

Washington saw [petitioner] with Derrick Cummins shortly after the shooting. Although Washington recognized [petitioner], he did not learn his name until some weeks later when he went to Lemon's house.

4

Lemon's father asked Washington what the shooter looked like, and Washington said he was short and chunky, and looked a bit like Lemon, in the face. Lemon's father then said that person was named Mike-Mike and that he and Cummins were riding around and had just left the area. Washington did not go to the police with this information.

On May 10, 2001, Washington identified [petitioner] as the shooter in a photographic lineup. There was never any doubt in Washington's mind that [petitioner] was the man who shot him, Lemon, and Keith T. On cross-examination, Washington testified that he told Sergeant Ferguson that the whole thing had started over a bundle of cocaine; Lemon got angry at Cummins and they threatened each other.

The trial court found Keith T. unavailable to testify at trial. His testimony from the preliminary hearing was therefore read to the jury. Keith T. was 16 years old. On March 15, 2001, he left is home shortly before 11:00 p.m. and walked to 83rd and Bancroft, where he saw Lemon ("Turtle") and Washington pull up in a primer gray Chevy Malibu. Lemon parked on 83rd, facing Bancroft, and got out of the car. Keith T. and Lemon talked briefly; then Keith T. went to the car and got into the driver's seat. At that point, Lemon had started talking to a female they knew.

While Keith T. and Washington were talking in the Malibu, a blue BMW with four "guys" inside pulled up and one of the guys asked if they wanted to sell the car. Washington told Keith T. that they had come by earlier, but only had $ 700, so they had come back with $ 1,200. The guys in the BMW went to park the car, and Keith T. lost sight of the car after it turned on Bancroft.

Keith T. then saw someone he had never seen before walking toward the Malibu from the direction the BMW had gone. He was wearing an orange or red sweater and maybe blue jeans. Keith T. testified that the man did not have a hood on, though Keith T. was not paying too much attention to him. He was about five feet eight inches to six feet one inch tall. He was heavy and weighed 190 to 200 pounds. Lemon, who was still across the street, walked over, met the man in the street, and they walked toward the Malibu. Keith T. and Washington were smoking a cigarette and laughing while Lemon and the man were talking next to the car. There was no arguing or yelling, and Keith T. thought the man had come to talk about the car. No one else was in sight. Keith T. identified [petitioner] as the man he saw with Lemon.

Lemon and [petitioner] talked for about a minute, and then [petitioner] asked if he could "'hit the cigarette'" Washington and Keith T. were smoking. Washington said to pass the cigarette to [petitioner]. Keith T. then heard about six to eight shots and saw sparks at the side of the car. He moved near Washington and told him to open the door. Washington said, "'I'm shot.'" Keith T. then was shot in the left shoulder; he got the door open, got out, and snatched Washington out of the car. Keith T. started running in the direction of 83rd and Dowling, toward his friend's mother's house. He saw Washington run

toward Bancroft. When he got to his friend's mother's house, he knocked on the door and said to call the police. The woman was scared and would not let him in, so he ran back to the scene, where he saw Lemon lying on the ground by the driver's door of the Malibu. The police arrived in less than five minutes and Keith T. was taken to Highland Hospital, where his wound was cleaned and bandaged.

Less than a week after the shooting, Keith T. saw [petitioner] riding in a car with other people at 105th and 98th. Keith T. saw [petitioner] two more times after that, but had no contact with him. One of the times Keith T. saw [petitioner], he was in a blue BMW at a gas station.

At some point after the shootings, the police showed Keith T. a photographic lineup and Keith T. selected the photograph of [petitioner] as looking most like the shooter, although he thought it possible that another man who looked like [petitioner] could be the shooter. The day after the shootings, police had shown him photographs of Derrick Cummins ("Heavy D"), and asked if he could have been the shooter. Keith T. said, "no, most definitely not. I know him too good. The guy who did this, I never seen before." Keith T. had known Cummins Keith T.'s entire life and was close to him. Keith T. saw Cummins, [petitioner], and some other people standing around talking about six weeks after the shooting. At the preliminary hearing, Keith T. testified that he was sure that [petitioner] was the man he saw outside the Malibu on March 15, 2001.

On March 15, 2001, at about 11:08 p.m., Oakland Police Officer Roland Holmgren was dispatched to the 2000 block of 81st Avenue, where he saw Dwayne Washington, who was yelling and saying he had been shot. Holmgren saw gunshot wounds to his arms and legs. Washington seemed to be in pain and was somewhat hostile. Washington was taken to Alameda County Hospital; Holmgren went to the hospital to check on his condition and obtain information about the shooting. Washington was uncooperative at the hospital and did not want to talk to the police. Washington said he knew who had shot him, but did not say who it was.

When police arrived at the scene, Lemon was lying in the middle of the street. They found a beer can on the sidewalk near the passenger side of the car and a sealed package of Web Van assorted brownies and bars on the front hood of the Malibu, near the driver's side. Fingerprints lifted from the Web Van package were those of the Web Van driver, who police determined was not associated with the case. Police did not check the car for fingerprints because they understood the shooter never touched the car.

Lemon died of a gunshot wound to his head; the bullet entered directly above his right ear. There was no stippling on Lemon, which indicated that the gun was fired from beyond 18 to 24 inches away. He had no other injuries. His blood showed that he had ingested cocaine between eight and 24 hours before he died. At the time of death, Lemon

was approximately five feet eight inches tall and weighed approximately 210 pounds.

Sergeant Jeffrey Ferguson of the Oakland Police Department later showed Keith T. a photographic lineup, and Keith T. identified the photograph of [petitioner] as the man who shot him. Ferguson also showed the photographic lineup to Dwayne Washington, who identified [petitioner's] photograph as that of the shooter as well.

<u>March 30, 2001 Incident Involving Curtis Luckey</u>

On March 30, 2001, between 3:00 a.m. and 4:00 a.m., Curtis Luckey was driving a gold Chevy Malibu, license number 4 BYH 983, in West Oakland. The car was registered to his mother. He came to that area of Oakland about once a week. He had driven to Oakland from Sacramento with a woman named Carmen. He dropped Carmen off and about 30 minutes later she paged him. He parked his car on 30th near Linden and started walking to a gas station at 34th or 35th and San Pablo, where he was going to meet Carmen. He left two spare keys, his cell phone, clothes, pictures, a driver's license, and a California identification card in the car.

As Luckey walked down 30th, approaching Myrtle, a maroon BMW came down 30th from San Pablo and pulled over 10 to 15 feet from him. A man got out from the passenger side of the car wearing black or dark clothes, including a dark cap. Luckey recognized the man as [petitioner]. He had seen [petitioner] two or three times before in the same neighborhood at about the same time of night. Luckey had first met [petitioner] a couple of months earlier when he came upon [petitioner] talking to someone Luckey knew. They talked for about 20 minutes, and [petitioner] gave Luckey his home phone number because [petitioner] said he was a rapper and Luckey said he knew people in the rap industry and might be able to "hook [him] up." [Petitioner] had said his name was "Askari." At some point, Luckey called the number [petitioner] had given him and had a short conversation with [petitioner]; he stored the number in his pager. He also gave [petitioner] a ride once. There had never been any hostility or conflict between them.

When Luckey saw [petitioner] get out of the car on March 30, 2001, he paused so [petitioner] could catch up. [Petitioner] walked up, pulled out a revolver, and pointed it an inch from Luckey's left temple. [Petitioner] said, "Break yourself. I want everything." Luckey assumed [petitioner] wanted whatever he had in his pockets. Luckey took $ 140 to $ 190 out of his jacket pocket and threw it on the ground. [Petitioner] kneeled down to pick up the money, still pointing the gun at Luckey's head. When [petitioner] straightened up, he sounded agitated as he said, "I want everything" and "I want your keys." Luckey reached into his pants pocket, took his keys out, and threw them on the ground.

[Petitioner] picked up the keys, while continuing to point the gun at Luckey's head. Luckey said, "Okay, you got me. You know, I'm

7

slipping. Please don't shoot me." [Petitioner] said, "shut up, bitch," and shot Luckey. The bullet went through his left cheekbone, through his sinus cavity, and came out his right cheekbone. The impact threw him to the ground. He immediately got up and ran up San Pablo. A woman saw him running and came to him. He assumed the BMW drove away, but did not see it and did not see where [petitioner] went. Luckey did not see anyone else while he was being robbed and shot.

When the first police officer arrived, Luckey told him he knew who had robbed and shot him. A police officer found his pager and Luckey told him Askari's number was in the pager. Later that morning, Luckey identified [petitioner] in a photographic lineup as the person who shot him. He also identified [petitioner] at the preliminary hearing.

On March 30, 2001, between 3:55 a.m. and 4:10 a.m., Oakland Police Officer Tony Bakhit responded to a call at 33rd Street and San Pablo Avenue regarding a man shot in the face. Once there, he contacted Luckey, who had blood all over his face and hands, and seemed very scared. Luckey said that a man named Askari had shot him at 30th and Myrtle, and had taken his car. Officer Bakhit found fresh blood and a pager at that location, but no casings or bullets. Nor did he find Luckey's gold Chevy Malibu. Later, Officer Bakhit went to the hospital, where Luckey was being treated for a gunshot wound to his left and right cheeks. Luckey confirmed that the pager was his, and located Askari's phone number for the officer.

On April 11, 2001, at approximately 5:40 p.m., AC Transit Police Officer Phil Rose was patrolling the bus zone at the Coliseum BART station in Oakland. He saw a beige or tan Chevy Malibu, license number 4 BYH 983, pull into the bus zone. Officer Rose activated his overhead lights and siren, and the car stopped. A very young white female was driving. She identified herself as Melissa R. She was 14 years old and did not have a driver's license. There were two black males in the car as well; one other person had left the car at the bus stop. A registration check showed that Melissa R. was a missing person and that the car had been stolen. The three people were detained for the Oakland Police Department.

Melissa R. testified that, in early 2001, she lived with her parents in North Oakland. She met [petitioner] ("Mike-Mike") in February 2001 through her friend, "Man." A couple of weeks later, at about 10:00 p.m., she was out on her bicycle trying to buy drugs for her father when she saw [petitioner] at an ARCO gas station. She asked him if he could get her some drugs, and he got her $10 worth of crack. They then went to [petitioner's] house to get his bike, rode to a house in West Oakland to get some marijuana, and rode back to Melissa R.'s house. Melissa R. began dating [petitioner] but, when [petitioner] started trying to pimp her, her father called him and said not to have anything to do with Melissa R., and they broke up. Melissa R. admitted that she had been a prostitute, but she never worked for [petitioner].

Melissa R. next saw [petitioner] at a gas station in East Oakland at 6:00 a.m., after she ran away from home. [Petitioner] was in a

"goldish, peachish" Chevrolet Malibu, which she had never seen before. She went with [petitioner] in the Malibu to another gas station in West Oakland, where he robbed a "crackhead," using a gun with a black handle. They got gas, then drove to [petitioner's] house. They parked a couple of blocks away from his house because he said he was wanted for punching somebody's face. They grabbed some things from [petitioner's] house, including clothes, rap lyrics, and pictures, and then drove the Malibu to the Sobrante Park area of Oakland.

[Petitioner] parked across the street from a store, got out of the car, and went to talk to a man in a blue Cadillac parked behind them. About 20 minutes later, [petitioner] and the man drove away in the Cadillac. The keys were in the Malibu, and Melissa R. jumped into the driver's seat and drove in the opposite direction. Melissa R. drove to Motel 6, where she had been staying, to look for "Malachi," but he was gone. Melissa R. was working for Malachi as a prostitute. He protected her and provided her with cocaine and marijuana. She then drove to the Dollar Inn, where a security guard sometimes let her stay in the security room.

Melissa R. then threw away everything that was in the car, except for some outfits she thought Malachi could wear and a photo album. She gave the gun [petitioner] had used at the gas station and a credit card to a man she had never seen before at East 14th and 4th Streets. There were some identification cards on the floor of the car in the name of Curtis Luckey, which she left there.

Melissa R. had the car for three days. On the day she was arrested, she had slept in the car. That afternoon, Malachi woke her up, and told her to pick up two people and to drop one of them off at the Coliseum BART station. After she dropped Marcello off at BART, an AC Transit police officer pulled her over; Malachi and another man were in the car with her.

Appellant's Arrest and the Subsequent Investigation

On April 12, 2001, at 6:26 p.m., pursuant to an arrest warrant, Officer Holmgren and his partner were looking for [petitioner] in East Oakland, after getting a tip from an informant. Holmgren saw [petitioner] driving alone in an older silver BMW. The officers, who were in uniform and driving an unmarked police car, activated the lights and siren on the car. [Petitioner] pulled over to the right side of the road for a couple of seconds, and then took off at a high rate of speed. As they approached 105th Avenue, traffic started bottlenecking and [petitioner] went into the left lane, going against traffic, at about 80 miles per hour. Eventually, [petitioner] crashed into a parked car, exited his vehicle, and began running away. Holmgren caught up with [petitioner] in a fenced backyard, told him to stop, and said that he was under arrest. [Petitioner] resisted when Holmgren tried to handcuff him, and it took Holmgren and his partner to subdue him enough to handcuff him.

Sergeants Ferguson and Galindo interviewed [petitioner] on May 15, 2001. During the interview, he told them he was a rap lyricist and performer. He also gave the officers his mother's, girlfriend's, and sister's telephone numbers. [Petitioner] was already in custody for the Luckey matter, and Sergeant Ferguson said he did not want to discuss that case. He asked [petitioner] if he knew Washington and Keith T. and whether there was any reason why they would say he committed the crimes against them and Lemon. Later that day, Sergeant Ferguson had him charged with murder and two additional counts of attempted murder. During the interview, [petitioner] told Sergeant Ferguson that he goes by the name Askari, which means soldier in Swahili.

Jillian Tague, an Alameda County Sheriff technician, maintained all files related to the Global Tel-Link computer telephone system at the Santa Rita jail. The telephone system records all outgoing telephone calls and keeps them on the computer for 60 days. Outside law enforcement personnel may request copies of telephone calls. Sergeant Ferguson requested all telephone recordings for the three phone numbers he had gotten from [petitioner]. He received recordings of phone calls that had been made to the phone number for [petitioner's] mother. He recognized [petitioner's] voice on the recording.

In the recording from a call on the night of May 15, 2001, after [petitioner] had been charged in the Lemon incident, [petitioner] talked about having been booked for murder. He also told his mother to call "Joe" and tell him "Wayne and Little Keith are running they mouths."

Sergeant Ferguson also obtained a search warrant to search [petitioner's] jail cell, primarily because [petitioner] had said he was a rap artist. In Sergeant Ferguson's experience, people who write rap lyrics often write about their criminal exploits in their songs. He searched the cell on May 17, 2001, and found a stack of rap lyrics and personal papers. In one song called "Show No Love," the first stanza read, "Nigga name Luckey wasn't Luckey in this. Ho chose, now he acting funny and shit." The second stanza read, "Copped then blew, now he weeping and shit. Love it when a fake nigga gives me his bitch." The 12th stanza read, "Caught 'em on da back street sett'em up. Stripped that nigga then I wett'em up." The 13th stanza read, "Be about pappa's, go further ya. Cross my nigga's, I'll murda ya."

The first stanza was significant to Sergeant Ferguson because [petitioner] spelled "Luckey" the way Curtis Luckey spells his name. The 12th stanza also was significant to his investigation because "sett'em up" is a term that "usually means to arrange to victimize someone. Either rob them, attack them, shoot them, or something like that." "Stripped" is a street term for "robbed." And "wett'em up" is a street term for a "bloody murder." Finally, the 13th stanza was significant because "cross my nigga's, I'll murda ya" means if you do something negative to one of my associates or friends, then "I'll murder ya." That stanza fit right into the murder of Dorman Lemon.

10

Defense Case

Derrick Cummins was called by the defense. In front of the jury, he refused to answer any questions on the ground that doing so might incriminate him.

Oakland Police Officer Jason Andersen testified that on March 15, 2001, he arrived at the scene of the shooting at around 11:00 p.m. Dorman Lemon was lying in the street and Keith T. was sitting on the sidewalk. Keith T. described the shooter as being tall, with a heavy build and light complexion. The description matched a person the officer knew as Derrick Cummins. Officer Andersen went to Cummins's house, but he was not home.

Oakland Police Officer Herbert Webber took a statement from Keith T. in the emergency room at Alameda County Hospital. Keith T. described the person who shot him as a Black man, six feet three inches to six feet four inches tall, 210 pounds, and wearing an orange T-shirt and light blue jeans.

[Petitioner] testified that he first met Curtis Luckey in early or mid-March 2001 at a small park in Oakland, where [petitioner], who is a rap musician, was rapping to about eight people he knew. Luckey said that he liked the lyrics and that he knew people in the music industry. Luckey asked for [petitioner's] phone number so that he could call [petitioner] after he talked to his contacts in the music industry.

[Petitioner] never spoke to Luckey on the phone, but he saw him about three times after they met. Once, [petitioner] was walking home and Luckey gave him a ride. Another time, he saw Luckey in the area with "his girls." Luckey said he was from Sacramento and was pimping six females in the area. [Petitioner] met one of the girls, who was called Princess. [Petitioner] saw her at least five times; they spoke to each other, but never had a romantic relationship.

On March 30, 2001, [petitioner] was driving home by himself in his BMW when he saw Luckey standing by a house on Myrtle Street near 30th. [Petitioner] stopped his car. Luckey walked up and said, "I heard you been fucking with my work. Stay away from my work." Luckey then "exposed a gun" to [petitioner]. [Petitioner] was shocked. He then got out of the car because "I couldn't drive off. The person done exposed a weapon to me. Two, I wanted to see what he was talking about, though. . . . We never had no kind of problems before." He asked Luckey what he was talking about. Luckey responded, "Just stay the hell away from my work. You know what I'm saying. You fucking with my pocket though." [Petitioner] then realized Luckey must have heard that [petitioner] was communicating with Princess and figured [petitioner] was trying to take his woman from him.

[Petitioner] told Luckey that he and Princess had done no more than speak to each other, but he did not get anywhere with Luckey, who said, "Stay the fuck away from my work. I'm going to have to do

11

something to you." Luckey was waving the gun up and down, and [petitioner] "went for" the gun and they tussled for no more than a minute. [Petitioner] got hold of Luckey's wrist and the tussle ended when the gun went off. [Petitioner] heard Luckey screaming and saw him running in the opposite direction. [Petitioner] ran and got in his car and drove home. [Petitioner] did not see a gold Chevrolet Malibu in the area that night.

[Petitioner] testified that he knew Melissa R.-although he had initially told police that he did not know her-and that he met her in February 2001 in West Oakland. She was going with a friend of [petitioner's] named "Man-Man," also known as John. According to [petitioner], all of Melissa R.'s initial testimony was true except he never had a relationship with her and never bought drugs while he was with her.

Sometime before he was arrested, [petitioner] was walking to the Coliseum BART station when he saw Melissa R. at a gas station in East Oakland. She had a newer silver car that looked like a rental car. [Petitioner] asked Melissa R. for a ride and she said she needed gas. He gave her $ 5 and she gave him a ride to his house in West Oakland. [Petitioner] grabbed some clothes, pictures, money, a CD disc changer, and rap lyrics from his house. Melissa R. then drove him back to East Oakland. He was staying at his friend, Derrick Cummins's ("Heavy D's") house in East Oakland because his car was not working, he planned to be working at a music studio in East Oakland for a couple of days, and he did not want to have to go back and forth between his house and East Oakland.

Melissa R. drove [petitioner] to Sobrante Park, where he told her to stop at a store because he wanted to get change for a $ 20 bill, so he could give her $ 10 for driving him back to East Oakland. He bought them each a hot dog and soda and got some change. When he came out of the store, Melissa R. was gone. He waited for 20 or 30 minutes, and then walked to Cummins's house.

On April 12, 2001, [petitioner] was driving back from the music studio to Cummins's house in his BMW when he noticed a black car close behind him. He pulled over, thinking that maybe the car was trying to pass him, but he took off when he saw doors opening and someone getting out of the car. A little later he saw the same car with sirens and realized it was a police car. Because he had already driven off at a high speed, he decided to keep running from the police. He eventually lost control of his car and hit another car. He then got out of his car and ran. The police officers eventually caught him in a fenced yard. They had their guns out and told him to get on the ground, which he did. One of them socked him in the head; the other one kicked him in the face. [Petitioner], who did not have a gun with him that night, was arrested and taken to a police station.

The next day, the police questioned [petitioner] about the Luckey incident. [Petitioner] was nervous, having never had charges

12

like this before. So at first, he lied to police, saying he had nothing to do with the incident. After he realized he was going to be charged regardless of what he said, he decided to tell the truth. [Petitioner] testified that he did not pull a gun on Luckey, rob him, take his car keys, drive his car, or shoot him. He did write the rap lyrics in question, but said he wrote them before he was arrested and had his mother send them to him in jail. He denied that the lyrics referred to any particular person. When he wrote the lyrics, he did not know Curtis Luckey's last name, and his spelling "lucky" as "Luckey" was just a coincidence.

With respect to the Lemon, Washington, and Keith T. incident, [petitioner] testified that on March 15, 2001, he was at home in West Oakland. [Petitioner], who is left-handed, had been stabbed in the left arm on March 2 and had stitches and a cast on his arm. The stitches were removed on March 14 and his arm was sore. In addition to his own injury, his mother and grandmother were sick with the flu, so he was staying at home. In the late evening hours of March 15, he was not on 83rd between Dowling and Bancroft, did not approach a primer-colored Malibu, and did not take out a gun and shoot at anyone.

Sergeants Ferguson and Galindo questioned [petitioner] on May 15, 2001. He told them he went by the names, Mike, Mike-Mike, and Askari. He gave them the phone numbers of his mother, his sister, and his girlfriend. He told them he knew Cummins, but did not know Dorman Lemon, Omar Harris (another name for Lemon), Turtle, Dwayne Washington, or Keith T. Sergeant Ferguson accused him of killing Lemon. [Petitioner] had heard and read about the shooting of someone named Turtle, but otherwise knew nothing about the incident. Ferguson also accused him of carrying out the hit for Cummins, which he denied.

After the interview, [petitioner] called his mother to let her know he had been charged with a new case. He told her the names the officers had mentioned during the interview and told her to call a friend to let him know about the new charges. He was not putting Keith T.'s and Washington's names out on the street as snitches. He wrote a letter and sent a newspaper clipping about the case to Cummins. At the end of the letter, he wrote, "Make sure you have this in mind so you will be tight." He did not write the letter so Cummins would match [petitioner's] story if he testified, but so that he would understand why [petitioner] was in custody. He also wrote in the letter that Keith T. had told Ferguson that [petitioner] shot him, but not to let Cummins know Keith T. was a snitch.

On August 4, 2001, [petitioner] wrote a letter to El Louise Carr, in which he told Carr that he was in custody for the murder of Lemon and that at first Cummins was a suspect. He also wrote that Cummins "didn't keep his mouth closed" and was "playing the John Gotti role and claiming credit for it . . . . [P] . . . [P] . . . until certain people . . . who had common sense realized he couldn't have done it." He also wrote that Cummins "told . . . or 'dry snitched' . . . because them detectives told me some shit that only . . . me, Hev [Cummins] and Jiz knew

about." He further wrote that he knew "Jiz didn't open his mouth unless he pulled a Sammy the Bull on me." Finally, [petitioner] wrote, "They have no gun, no bullet shells, no fingerprints, and I know . . . for a fact that they have no witnesses that seen me do shit." He asked Carr to make sure no one ever saw the letter.

Prosecution Rebuttal

Sergeant Robert Nolan, an Oakland police investigator, interviewed [petitioner] on April 13, 2001, regarding the Luckey incident. [Petitioner] initially said that he had not been involved in the shooting and that another person named John was responsible for shooting Luckey. Nolan then told [petitioner] (falsely) that the police were going to do a gunshot residue test on [petitioner's] hands "in order to try and elicit a statement of a more truthful nature" from [petitioner]. While waiting for the result of the "test," [petitioner] admitted he was more closely involved than he had originally  stated. He claimed that he pulled up in a car, and then drove off after Luckey brandished a weapon at him. He then changed his story again, saying that he drove to the area, was approached, and got out of the car at gunpoint. A struggle for the gun ensued, during which the gun discharged. At that point, [petitioner] left the scene.

People v. Key, No. A101381, 2005 Cal. App. Unpub. LEXIS 3623, at **4-34 (Cal. Ct. App. Apr. 25, 2005) (footnotes omitted).

# DISCUSSION

## I.    Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## II.    Claims

Petitioner raises numerous claims for relief under § 2254: (A) the trial court erroneously excluded out-of-court statements; (B) the trial court erroneously

15

denied  severance of the two cases; (C) instructional error; (D) the sentence imposed by the trial court constitutes cruel and/or unusual punishment; (E) the trial erroneously refused to order the prosecutor to compartmentalize the two cases; (F) the trial court refused to exclude the rap lyrics; (G) prosecutorial misconduct; (H) the trial court erroneously allowed the prosecutor to display inflammatory photos during closing arguments; and (I) the trial court erroneously allowed illegally intercepted phone calls into evidence.

### A.    Exclusion of Out-of-Court Statements

Petitioner claims the trial court violated his constitutional right to due process, a fair trial and to present a complete defense by excluding out-of-court statements by Derrick Cummins.  Petitioner contends that the statements should have been admitted as declarations against penal interest.

The California Court of Appeal summarized the facts underlying petitioner's claim as follows:

> Before trial began, on July 9, 2002, the prosecutor filed a motion to exclude irrelevant evidence, specifically, to require an offer of proof pursuant to Evidence Code section 402, before the defense would be permitted to present the testimony of potential witness Alvin Horn. On July 11, 2002, [petitioner] filed a written offer of proof regarding statements allegedly made to Horn by Derrick Cummins. [Petitioner] cited Sergeant Ferguson's follow-up report of April 11, 2001, in which he stated that informant "X"-later identified as Horn-said that he was present when Cummins and Michael Anderson ("Marcel") got into an argument about drugs. [Petitioner] argued that Horn and Anderson were potential witnesses on whether Cummins had admitted responsibility for shooting Lemon, Washington, and Keith T. The trial court initially prohibited any mention of this evidence until it could hear additional evidence to determine if the evidence was relevant.

> At a July 24, 2002 pretrial hearing, Sergeant Ferguson testified about his April 11, 2001 interview with Horn regarding the Lemon, Washington, and Keith T. shootings. He said that Horn reported overhearing an argument over drugs between Cummins and Anderson, during which Cummins said, "You better ask your partner Keith how we been lighting motherfuckers up." Ferguson understood that "Keith" referred to Keith T.

> In a taped portion of the interview, Horn said that some two

16

weeks before the interview, he was with a man named "Heavy D" (Cummins), "Marcel" (Anderson), and an unknown person. They all had just run from the police. Cummins got into an argument with the unknown person about drugs, and said, "'I been killin' niggers out here for nothin'.'" Anderson then snuck into his house and came out with a pistol. Cummins said "a few more words" and then left. Ferguson asked Horn who Keith was, and Horn said that Keith was the person who got shot with "Turtle" (Lemon). Ferguson understood Horn to be saying that Cummins was claiming that he was involved in the shootings in some way.

Ferguson interviewed Cummins on June 15, 2001, but did not ask him about the statements Horn alleged he had made. Cummins did admit he told Keith T. not to testify in this case. Cummins said Keith T. had told him, "'Man, Dude was hangin' around you and I think Dude might have, you know, shot me, I think. You know what I'm sayin'?'"

Defense counsel told the court that he intended to have Cummins, Horn, and Anderson appear. He argued that if Cummins was unavailable, his statements should be admitted through Horn as statements against penal interest. The court and the parties agreed to take the question up later.

On August 14, 2001, after the prosecution had concluded its case-in-chief, the court and counsel again addressed the issue of Cummins's statements. The court considered the transcripts of a police interview with Cummins on June 15, 2001, and Sergeant Ferguson's notes from the Horn interview.

The court summarized the evidence in question: Horn was in custody when Lemon was killed, and when Cummins referred to killing people, Horn thought Cummins was saying he shot Keith T. In his interview, Cummins had indicated that, about four days before Lemon was killed, he and Lemon had had a minor altercation concerning cocaine they bought together. Cummins put his bundle of cocaine in the backyard and used Lemon's car to drop off his girlfriend. When he got back, his bundle was gone. He therefore kept Lemon's car. According to Cummins, there were no threats to kill anyone; it was merely a disagreement. In the interview, Cummins denied telling [petitioner] to "take care of" Lemon and denied involvement in any shooting. There were rumors he was involved and he was talking to police because he wanted to clear his name.

The trial court ruled that the defense could call Cummins as a witness. If Cummins were to deny making the statements in question, counsel could call Horn to impeach Cummins. However, if Cummins invoked his Fifth Amendment right and refused to answer questions, "there would be no need for Horn."

Defense counsel called Cummins as a witness. Cummins invoked the Fifth Amendment to every question asked, including whether he had had a conversation with Horn and Anderson about

Lemon's shooting and whether he told them they "had better ask Little Keith how we been lighting M.F.s up."

Shortly thereafter, at a hearing outside the presence of the jury, defense counsel expressed his intention to call Alvin Horn to testify about Cummins's alleged statements. After further argument by defense counsel and the prosecutor, the trial court ruled "that Mr. Alvin Horn will not be allowed to testify simply because the statements made by Alvin Horn to the police officers, the one that has been referenced to by both [counsel] is too vague to be frankly against penal interest."

People v. Key, 2005 Cal. App. Unpub. LEXIS 3623 at **34-38 (footnote omitted).

The California Court of Appeal accepted the trial court's findings and rejected petitioner's improper exclusion of evidence claim.  After discussing the controlling legal principles, it explained:

First, the trial court reasonably found that Cummins's statements, in context, were too vague to meet the requirements of Evidence Code section 1230. The two alleged statements in question-"You better ask your partner Keith how we been lighting motherfuckers up" and "'I been killin' niggers out here for nothin'"" "-did not unambiguously refer to the Lemon, Washington, and Keith T. shootings or to Cummins's participation in them. Even assuming "Keith" referred to Keith T., the first statement, about what "we" had been doing, was as likely to refer to the activities of Cummins's associates (e.g., [petitioner]) as to himself; nor was the statement plainly about the Lemon, Washington, and Keith T. shootings in particular. The second statement, in which Cummins spoke of his own actions, was indefinite as to whom he had supposedly killed. Thus, neither statement specifically linked Cummins to the shootings in question, and the trial court reasonably found that they were not frankly against his penal interest.

Moreover, the context in which the statements were made does not render them especially trustworthy. Cummins allegedly made the comments during a dispute about drugs, in which Cummins apparently was trying to show how tough he was and to instill fear in the people he was arguing with, in order to get his way. The reliability of the statements thus is clearly questionable.

Consequently, the trial court did not abuse its discretion when it excluded the statements because they did not meet the requirements of Evidence Code section 1230.

Having found that exclusion of these statements does not violate Evidence Code section 1230, we also conclude that there was no violation of [petitioner's] constitutional rights to due process, to a fair trial, and to present a complete defense.

18

People v. Key, 2005 Cal. App. Unpub. LEXIS 3623 at **40-43 (citations and footnote omitted).

Petitioner claims the trial court was wrong in concluding that the statements were "too vague" to be against Cummins' penal interest. He argues that there was a great deal of evidence suggesting Derrick Cummins' involvement in the March 15, 2001 shootings. He also argues that when Cummins specifically referred to "Keith," he was "clearly stating that he (and perhaps others) had shot [Keith T]." But even if the exclusion of the statement was error under section 1230, failure to comply with state evidentiary rules is neither a necessary nor a sufficient basis for granting federal habeas corpus relief on due process grounds. See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). The issue here is whether petitioner is entitled to federal habeas relief because the exclusion of Cummins' statements rendered petitioner's trial fundamentally unfair. The California Court of Appeals' determination that the exclusion of Cummins' statements did not violate due process was not contrary to, or involved an unreasonable application of clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d).

Generally speaking, the exclusion of evidence that is "highly relevant" to a defense contravenes due process. See Green v. Georgia, 442 U.S. 95, 97 (1979) (finding a due process violation when testimony excluded at trial "was highly relevant to a critical issue in the punishment phase of the trial" regardless of the state's hearsay rule); Chambers v. Mississippi, 482 U.S. 284, 302-03 (1973) (holding that exclusion of third-party testimony that was "critical evidence" violated due process). In deciding whether the exclusion of evidence violates due process, a court balances the following factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable

of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.  Chia v. Cambra, 360 F.3d 997, 1004 (9th Cir. 2004); Drayden v. White, 232 F.3d 704, 711 (9th Cir. 2000).  The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based.  See Chia, 360 F.3d at 1006 (California's interest in excluding reliable statements that were "extraordinarily" relevant to matter of petitioner's guilt or innocence, while importance to petitioner was immense).

Even if the exclusion of evidence amounts to a violation of due process, habeas relief may be granted only if the error had a substantial and injurious effect on the verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  In other words, the error must have resulted in "actual prejudice."  Id.

Application of the Chia factors indicates that Cummins' out-of-court statements were not critical evidence and exclusion thereof did not violate petitioner's due process rights.  First, the statements did not have probative value in petitioner's favor.  They were vague and general and, given petitioner's prior relationship with Cummins, the statements were just as likely to implicate petitioner in the March 15, 2001 shootings as they were to implicate Cummins.  Second, the excluded statements cannot be said to be reliable because Cummins allegedly made them during a dispute about drugs in which he was trying to instill fear in the people he was arguing with.  Third, the statements were sufficiently vague and general that they were not likely capable of evaluation by the trier of fact.  Fourth, the excluded statements were not the sole evidence on the issue of Cummins' involvement.  See Chia, 360 F.3d at 1004.

Importantly, any error was harmless because it had no substantial and injurious effect on the verdict.  See Brecht, 507 U.S. at 637.  The excluded

statements do not pertain to the Luckey case and, to the extent that they pertain to the Lemon/Washington/Keith T. case, both of the surviving victims identified petitioner as the shooter in photographic lineups and at trial. Keith T. even denied that Cummins was the shooter. He had grown up with Cummins and knew him well. Moreover, the excluded statements were neither reliable nor extraordinarily relevant to petitioner's defense. Under these circumstances, it cannot be said that "error" from the exclusion of the statements had a substantial and injurious effect on the jury's verdict. See Brecht, 507 U.S. at 637.

Petitioner is not entitled to federal habeas relief on his exclusion of evidence claim. The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

### B.    Denial of Severance

Petitioner claims he was denied due process when the trial court refused to sever the charges regarding the Lemon/Washington/Terry incident from those regarding the Luckey incident.

The California Court of Appeal summarized the issue as follows:

> [Petitioner] moved to sever the charges, arguing that he wanted to testify in the Luckey case because he was the only witness there, other than Luckey, and he wanted to argue self defense. On the other hand, he did not want to testify in the Lemon, Washington, and Keith T. case because "the evidence on those cases is so weak that he has a right to sit back and put the Prosecution to their burden of proving them beyond a reasonable doubt."

> The trial court denied the motion to sever, explaining: "[Petitioner] gives no reason as to why he does not want to testify in the [Lemon, Washington, Keith T.] counts. He simply asserts that the evidence is insufficient to convince a jury beyond a reasonable doubt. [¶] And based upon that offer of proof, the Court is going to deny the motion to sever. The Court, however, will entertain a motion at the end of the Prosecution's case if there is sufficient showing at that time, but at least as to the issue of cross-admissibility under [Evidence Code

21

section] 1101(b), I believe that the evidence would be cross-admissible. It doesn't seem to me that any of the charges would unusually inflame the jurors. I mean, there's shootings of people.

"And it seems to me that although you point out some impeachment evidence where you may be able to impeach some of the witnesses [in the Lemon, Washington, Keith T. case], at least as far as the Court is concerned, up to this point, I don't see either case as either a strong or weak case. They're certainly not weak cases, and at least from what I can see so far, they're fairly strong cases." Finally, the court noted that joinder would not convert the matter into a capital case.

People v. Key, 2005 Cal. App. Unpub. LEXIS 3623 at **43-44.

The California Court of Appeal rejected petitioner's claim.  It explained:

The statutory requirements for joinder were satisfied in this case because both incidents involved the same class of crimes: murder and attempted murder. (See People v. Sandoval (1992) 4 Cal.4th 155, 172 (Sandoval).) Since the requirements for joinder were satisfied, and since "[t]he law prefers consolidation of charges, ... [petitioner] can predicate error in the denial of the motion only on a clear showing of potential prejudice." ( People v. Ochoa (2001) 26 Cal.4th 398, 423.) We review the trial court's denial of a motion for severance for an abuse of discretion resulting in a substantial danger of prejudice. ( People v. Mayfield (1997) 14 Cal.4th 668, 720; Sandoval, at p. 172.)

Factors that guide the trial court's discretion in ruling on such motions include whether: "(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]" ( Sandoval, supra, 4 Cal.4th at pp. 172-173.)

In the present case, [petitioner's] request for severance was based on the asserted tension between his need to testify in the Luckey case, in which there were no other witnesses and he claimed self defense, and his desire not to testify in the Lemon, Washington, and Keith T. case, which he believed was weak and in which he wanted to put the prosecution to its burden of proof.

[¶] . . . [¶]

In this case, we . . . find that [petitioner's] bare declaration that the Lemon, Washington, and Keith T. case was so weak that he had the right to sit back and make the prosecution satisfy its burden of proving him guilty beyond a reasonable doubt simply did not give the trial court "enough information to satisfy the court that the claim of prejudice

[was] genuine and to enable it to weigh the considerations of economy and expedient judicial administration against [petitioner's] interest in having a free choice with respect to testifying." (Citation omitted).

[¶] . . . [¶]

We conclude the trial court did not abuse its discretion in finding that [petitioner] did not provide a """"convincing showing that he [had] ... [a] strong need to refrain from testifying"""" in the Lemon case. (Citation omitted).

Although, in his motion and his argument to the trial court regarding severance, [petitioner] did not focus on other factors related to the potential prejudice of failing to sever, we do not believe the trial court abused its discretion in finding those factors inapplicable. (See Sandoval, supra, 4 Cal.4th at pp. 172-173.)

First, even assuming the trial court was wrong, as [petitioner] argues, when it found that the offenses would be cross-admissible in separate trials, "the absence of cross-admissibility does not, by itself, demonstrate prejudice." (People v. Kraft (2000) 23 Cal.4th 978, 1030.) "Cross admissibility suffices to negate prejudice, but it is not needed for that purpose." (People v. Memro, supra, 11 Cal.4th at p. 850; see also § 954.1 [added by Proposition 115 in 1990, section 954.1 provides that "evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact"].)

Second, we do not believe that either case was unusually likely to inflame the jury against [petitioner]. (See Sandoval, supra, 4 Cal.4th at p. 172.) In both cases, the evidence showed that [petitioner] walked up to unarmed victims and shot them, either for no apparent reason or as part of a robbery. Thus, neither case was especially likely to inflame the jury when compared with the other.

Third, we reject [petitioner's] claim that both cases were weak "so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges." (Sandoval, supra, 4 Cal.4th at pp. 172-173.) Both cases rested primarily on eyewitness identifications. While [petitioner] claimed self defense in the Luckey case, and there were some inconsistencies in Washington's and Keith T.'s descriptions of the assailant, the trial court did not abuse its discretion in finding that the eyewitness testimony was strong overall. We also note the fact that "[w]henever a defendant is tried for multiple crimes of the same class, the jury will be presented with evidence that the defendant committed multiple offenses. This necessary concomitant of joinder is not sufficient to render the joinder unduly prejudicial. If it were, joinder could never be permitted." (People v. Hill (1995) 34 Cal.App.4th 727, 735.)

The fourth factor concerning the potential prejudice of failing to sever-whether one of the charges carries the death penalty-is

23

inapplicable to the present case. (See <u>Sandoval</u>, <u>supra</u>, 4 Cal.4th at p. 173.)

We conclude that [petitioner] did not demonstrate that the potential for substantial prejudice outweighed the benefits to the state from joinder, and the trial court did not abuse its discretion in denying his motion for severance. (Citation omitted).

Finally, [petitioner] asserts that the trial court's refusal to sever resulted in gross unfairness amounting to a denial of due process. (See <u>Sandoval</u>, <u>supra</u>, 4 Cal.4th at p. 174.) Having reviewed the evidence introduced at trial, there is no indication in the record of improper reliance on the evidence supporting counts in the Luckey case for conviction in the Lemon, Washington, and Keith T. case, or vice versa. Accordingly, we find neither actual nor potential prejudice amounting in a denial of due process.

<u>People v. Key</u>, 2005 Cal. App. Unpub. LEXIS 3623 at **45-55 (footnote omitted).

The California Court of Appeal's rejection of petitioner's denial of severance claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).

A state trial court's refusal to sever charges will give rise to a federal constitutional violation only if the "simultaneous trial of more than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process."  <u>Davis v. Woodford</u>, 384 F.3d 628, 638 (9th Cir. 2004).  To prevail in federal habeas, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair, <u>Grisby v. Blodgett</u>, 130 F.3d 365, 370 (9th Cir. 1997), and that the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict, <u>Sandoval v. Calderon</u>, 241 F.3d 765, 772 (9th Cir. 2000) (citing <u>Brecht</u>, 507 U.S. at 637).

There is a risk of undue prejudice whenever joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible.  <u>United States v. Lewis</u>, 787

24

F.2d 1318, 1322 (9th Cir. 1986). This risk is especially great when the prosecutor encourages the jury to consider the two sets of charges in concert, e.g., as reflecting a modus operandi even though the evidence is not cross admissible, and when the evidence of one crime is substantially weaker than the evidence of the other crime. Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir. 1998). But joinder generally does not result in prejudice sufficient to render a trial fundamentally unfair if the evidence of each crime is simple and distinct (even if the evidence is not cross admissible), and the jury is properly instructed so that it may compartmentalize the evidence. Id. at 1085-86.

Even if the evidence relating to the two incidents in petitioner's case was not cross admissible, the joinder of the charges relating to the two incidents cannot be said to have rendered his trial fundamentally unfair. This was not a case in which the prosecutor encouraged the jury to consider the two sets of charges in concert, or in which a weak  evidentiary charge was joined with a much stronger one. Cf. id. at 1084-85. The evidence of each crime was straight-forward and distinct, and the jury was properly instructed so that it could compartmentalize the evidence. See RT 1130; Calderon, 163 F.3d at 1085-86. The evidence of each of the crimes was also substantial – eyewitness identifications and other evidence presented at trial overwhelmingly supported the prosecution's case as to both incidents – and indicated that in both incidents petitioner walked up to unarmed victims and shot them. Given the similarity of the two incidents, neither was likely to inflame the jury when compared with the other. The joinder of charges in petitioner's case cannot be said to have rendered his trial fundamentally unfair.

Petitioner's assertion that he wished to testify regarding the Luckey incident but not the Lemon/Washington/Terry incident does not compel a different conclusion. When a defendant seeks to testify on only some of the charges against

him, the prejudice from joinder "may be established only by a persuasive and detailed factual showing regarding the testimony [that the defendant] would give on the one count he wishes severed and the reason he cannot testify on the other counts." Class v. Leapley, 18 F.3d 574, 578 (8th Cir. 1994). Petitioner makes no such showing. Nor has been shown, in view of the substantial evidence of guilt presented at trial as to each of the charges, that the joinder of charges had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 637.

Petitioner is not entitled to federal habeas relief on his refusal to sever claim. The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

### C.   Instructional Error

Petitioner raises three claims for relief based on instructional error: (1) failure to give imperfect self-defense instructions; (2) failure to give CALJIC No. 5.15; and (3) improperly giving CALJIC No. 2.04.

To obtain federal habeas relief for error in the jury charge, petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire, 502 U.S. 62, 72 (1991). The error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. Id. Petitioner must also show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief. Calderon v. Coleman, 525 U.S. 141, 146 (1998) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state trial court's failure to give an instruction does not alone raise a

26

ground cognizable in federal habeas corpus proceedings.  <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988).  The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  <u>Walker v. Endell</u>, 850 F.2d 470, 475-76 (9th Cir. 1987).  A habeas petitioner whose claim involves failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an "especially heavy burden."  <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir. 1997) (quoting <u>Henderson v. Kibbe</u>, 431 U.S. 145, 155 (1977)).

### 1.     Failure to Give Imperfect Self-Defense Instruction

Although the trial court gave instructions on complete self-defense, no instruction on imperfect self-defense was given.  Petitioner claims that this instructional omission denied the jury the option of finding petitioner guilty of the lesser included offense of attempted voluntary manslaughter regarding the Luckey shooting.  Petitioner further asserts that the omission constituted prejudicial error.

Petitioner's claim fails because the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim.  <u>See</u> <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000); <u>Windham v. Merkle</u>, 163 F.3d 1092, 1105-06 (9th Cir. 1998).  Furthermore, there is no clearly established Supreme Court authority requiring such instructions. Although the Supreme Court has held that a failure to instruct on a lesser-included offense may be constitutional error in a capital case, <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980), it has not extended this holding to non-capital cases.

The Ninth Circuit has suggested that "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." <u>Solis</u>, 219 F.3d at 929.  The Ninth Circuit's observation in <u>Solis</u> – that the failure to give an instruction on lesser-included

27

offenses may violate a defendant's constitutional right to adequate jury instructions on his theory of the case – does not compel a different result here because it is not based on clearly established Supreme Court precedent, as required by 28 U.S.C. § 2254(d). See, e.g., Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993) (rejecting claim that jury instructions violated defendant's constitutional right to a meaningful opportunity to present a defense because the cases in which the Court has invoked this principle dealt either with the exclusion of evidence or the testimony of a defense witness; none of them involved restrictions on a defendant's ability to present an affirmative defense).

Petitioner's claim would fail even if Solis applied. The California Court of Appeal rejected petitioner's claim on the grounds that the evidence did not support an instruction on imperfect self-defense and, in any event, its omission was harmless. The court explained:

> "Self-defense requires an actual and reasonable belief in the need to defend against an imminent danger of death or great bodily injury. [Citation.] If, however, the killer actually, but unreasonably, believed in the need to defend himself or herself from imminent death or great bodily injury, the theory of 'imperfect self defense' applies to negate malice. [Citation.] The crime committed is thus manslaughter, not murder. [Citation.]" (Citations omitted).

> Imperfect or "unreasonable" self-defense is "not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter, whether it arises from unreasonable self-defense or from a killing during a sudden quarrel or heat of passion, is not a defense but a crime; more precisely, it is a lesser offense included in the crime of murder. Accordingly, when a defendant is charged with murder the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." (Citations omitted).

> [¶] . . . [¶]

> Here . . . Luckey testified that [petitioner] pulled a gun on him, robbed him, and then shot him in the face, while [petitioner] testified that Luckey pointed a gun at him and threatened to harm him.

According to [petitioner's] version of events, defending himself against Luckey would necessarily have been reasonable. Thus, under the particular facts of this case . . . the evidence did not support an instruction on imperfect self-defense. (Citation omitted).

Second, even if the court erred in failing to give an imperfect self-defense instruction, the error clearly was harmless. By convicting [petitioner] of attempted first degree murder of Luckey, the jury explicitly found that [petitioner] acted willfully, deliberately, and with premeditation. This finding is inconsistent with [petitioner's] having an actual, but unreasonable belief that he needed to kill to defend himself. The jury was instructed, pursuant to CALJIC No. 8.20, that "[t]he word 'willful' means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word 'premeditated' means considered beforehand."

In deciding that [petitioner] acted willfully, deliberately, and with premeditation, the jury necessarily rejected any lesser offense, such as second degree murder or manslaughter. (Citation omitted). Accordingly, even had the court instructed the jury on imperfect self-defense, it is not reasonably probable that a result more favorable to [petitioner] would have been reached in the absence of the purported error. (See People v. Breverman, supra, 19 Cal.4th at p. 176, citing People v. Watson (1956) 46 Cal.2d 818.)

People v. Key, 2005 Cal. App. Unpub. LEXIS 3623 at **57-61 (footnotes omitted).

Under Solis there must be substantial evidence to warrant the instruction on the lesser-included offense.  See Solis, 219 F.3d at 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice); see also  Cooper v. Calderon, 255 F.3d 1104, 1110-11 (9th Cir. 2001) (no duty in death penalty case to instruct on second degree murder as a lesser included offense because the evidence established that the killer had acted with premeditation, so if the jury found that the defendant was the killer, it necessarily would have found that he committed first degree murder).  The California Court of Appeal reasonably determined that there was not.  It also

29

reasonably determined that, in view of the jury's verdict of attempted first degree murder, the court's failure to give an imperfect self-defense instruction did not actually prejudice petitioner.  See Brecht, 525 U.S. at 637.  Petitioner would not be entitled to relief even if Solis applied here.

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on this claim.

## 2.      Failure to Give CALJIC No. 5.15

Petitioner claims that the trial court committed prejudicial error when it refused to give CALJIC 5.15, as requested by petitioner's defense counsel, which would have informed the jury that the burden was on the prosecution to prove that the attempted murder of Luckey was unlawful.

CALJIC No. 5.15 provides: "Upon a trial of a charge of murder, a killing is lawful if it was [justifiable] [excusable].  The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is, not [justifiable] [excusable].  If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty."

The California Court of Appeal found that CALJIC No. 5.15 should have been given because a defendant is entitled, upon request, to an instruction that pinpoints the theory of defense under California law.  But it rejected the claim on the ground that, when considered in the context of the instructions as a whole, the failure to give CALJIC No. 5.15 was harmless.  The court explained:

> Section 1096a provides: "In charging a jury, the court may read to the jury Section 1096 [articulated in CALJIC No. 2.90], and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given." Despite section 1096a, a

defendant is entitled, upon request, to an instruction that pinpoints the theory of the defense. (People v. Hughes (2002) 27 Cal.4th 287, 361, citing People v. Saille (1991) 54 Cal.3d 1103, 1119.) CALJIC No. 5.15 has been characterized as a pinpoint instruction. (See People v. Adrian (1982) 135 Cal.App.3d 335, 340-341.) However, courts have found that the failure to give CALJIC No. 5.15 is harmless error when the jury is otherwise properly instructed on the burden of proof. (See, e.g., People v. Wittig (1984) 158 Cal.App.3d 124, 135-136 [error in failing to give CALJIC No. 5.15 harmless where jury was instructed with CALJIC Nos. 2.90 and 2.01]; People v. Adrian, at p. 342 [same].)

Here, the trial court instructed the jury with CALJIC No. 2.90, which fully apprised the jury that the prosecution had to prove [petitioner's] guilt beyond a reasonable doubt, as well as with CALJIC No. 2.01, which further told the jury that each fact on which an inference essential to establish guilt necessarily rests must be proved beyond a reasonable doubt. We find that these instructions, together with the other instructions given (e.g., CALJIC No. 8.67 [prosecution has burden of proving that attempted murders were willful, deliberate, and premeditated beyond a reasonable doubt], were sufficient to apprise the jury of the prosecution's burden of proving beyond a reasonable doubt that the attempted murder of Luckey was unlawful. Accordingly, the court's error in refusing to instruct the jury with CALJIC No. 5.15 was harmless.

People v. Key, 2005 Cal. App. Unpub. LEXIS 3623 at **64-66 (footnotes omitted).

The California Court of Appeal's rejection of petitioner's claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The court reasonably determined that, in view of the jury charge as a whole, the jury was adequately informed that the prosecution had the burden of proving beyond a reasonable doubt that the attempted murder of Luckey was unlawful. Cf. United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996) (defendant not entitled to have jury instructions raised in his or her precise terms where given instructions adequately embody defense theory). Petitioner is not entitled to federal habeas relief on this claim.

### 3.    Improper Giving of CALJIC No. 2.04

Petitioner claims that the trial court erred in instructing the jury with

31

CALJIC No. 2.04, which read, "If you find that the defendant attempted to or did fabricate evidence to be produced at trial, that conduct may be considered by you as a circumstance tending to show consciousness of guilt and its weight and significance, if any, are for you to decide."  Petitioner argues that CALJIC No. 2.04 is limited to situations where a defendant attempts to induce a witness to lie at trial or otherwise tries to fabricate evidence for trial.  The jury not being aware of this limiting construction, petitioner argues that the instruction may have been improperly applied to infer consciousness of guilt from some other perceived misconduct of petitioner.  Petitioner further contends that under these circumstances, the error was prejudicial.

Petitioner's claim fails because the California Court of Appeal reasonably found substantial evidence from which the jury could conclude that petitioner attempted to induce a witness to lie at trial or otherwise tried to fabricate evidence for trial.  The state court explained:

> There was substantial evidence from which the jury could conclude that [petitioner] attempted to induce a witness to lie at trial or otherwise tried to fabricate evidence. (See People v. Boyette, supra, 29 Cal.4th at p. 439.) In particular, there was evidence that, after his arrest, [petitioner] wrote a letter and sent a newspaper clipping about the Lemon, Washington, and Keith T. case to Cummins. At the end of the letter, he wrote, "Make sure you have this in mind so you will be tight." This evidence, which suggests that [petitioner] was attempting to induce Cummins to lie at [petitioner's] trial, warranted use of CALJIC No. 2.04.

People v. Key, 2005 Cal. App. Unpub. LEXIS 3623 at *69 (footnote omitted).

The California Court of Appeal's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  There was ample evidence to support the instruction under California law and, in view of the strength of the evidence against petitioner, it cannot be said that giving CALJIC No. 2.04 had a substantial and injurious effect

on the verdict.  See Brecht, 507 U.S. at 637.  Petitioner is not entitled to federal habeas relief on grounds that the state trial court improperly gave CALJIC No. 2.04.

### D.  Cruel and Unusual Punishment

Petitioner claims that his sentence of 114 years to life plus 33 years constitutes cruel and unusual punishment under the federal and state constitution. According to petitioner, this is so because the chances of completing his sentence in his remaining lifetime are "virtually nil."

A criminal sentence that is not proportionate to the crime for which the defendant was convicted violates the Eighth Amendment.  Solem v. Helm, 463 U.S. 277, 284 (1983) ("[The Eighth Amendment] prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed.").  But the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime."  Ewing v. California, 538 U.S. 11, 23 (2003).  A sentence will be found grossly disproportionate only in "exceedingly rare" and "extreme" cases.  Lockyer v Andrade, 538 US 63, 73 (2003).

The California Court of Appeal reasonably concluded that the fact that petitioner's sentence of 114 years to life plus 33 years cannot be served during his lifetime does not constitute cruel and unusual punishment.  Petitioner was convicted of one count of first degree murder (as well as three counts of attempted murder) and it is well-established that life without parol for a first degree murderer does not raise an inference of gross disproportionality.  Harris v. Wright, 93 F.3d 581, 584 (9th Cir. 1996); see also Solem v. Helm, 463 U.S. 277, 290 n.15 (1983) ("no sentence of imprisonment would be disproportionate" to felony murder).

Petitioner is not entitled to federal habeas relief on grounds that his sentence constitutes cruel and unusual punishment.  The state court's rejection of the claim

1   cannot be said to be contrary to, or an unreasonable application of, clearly

2   established Supreme Court precedent, or be based on an unreasonable

3   determination of the facts.  See 28 U.S.C. § 2254(d).

4   ### E.   Refusal to Compartmentalize

5   Petitioner claims that the trial court committed prejudicial error when it

6   denied his motion to order the prosecutor to compartmentalize the two cases from

7   one another.  Petitioner further asserts that the trial court's refusal to

8   compartmentalize violated his due process rights.

9   After the trial court denied petitioner's motion to sever, it stated that it

10  would entertain a renewal of the motion following the prosecution's case.  The

11  following exchange then took place:

12      [DEFENSE COUNSEL]:    Perhaps I should move that, I will
        move that the Prosecution be ordered to proceed only on the one
13      incident, whichever one she chooses to proceed on first, and at the end
        probably proceed on Dorman Lemon and then the Keith Terry and
14      Dwayne Washington case before any evidence is presented on the
        Luckey case so we can then make the determination as to whether
15      severance would be appropriate.  Seems to me that's the only way
        technically it could be done.

16
        THE COURT:    Well, I don't believe that that is the truth.
17
        [DEFENSE COUNSEL]:   I will make that motion.
18
        THE COURT:    That motion will be denied.  I'm not going to
19      tell the district attorney how to prosecute a case.

20  RT 48-49.

21  It is unclear what grounds petitioner relies on for this claim.  To the extent

22  that petitioner's claim relies on the same arguments as his refusal to sever claim, it

23  must fail for the same reasons.  See Section II.B., supra, at 21-26.  If petitioner is

24  alluding to a separate right to compartmentalization of the evidence, his claim is

25  baseless.  A right to compartmentalization is not supported by "clearly established

26  Federal law, as determined by the Supreme Court of the United States."  See 28

27

28  34

U.S.C. § 2254(d)(1).

Petitioner is not entitled to federal habeas relief on grounds that the trial court refused to force the prosecutor to compartmentalize the two cases from one another. The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

### F. Admission of the Seized Rap Lyrics

Petitioner claims that the trial court committed prejudicial error when it denied his motion in limine to exclude from evidence rap lyrics seized from his jail cell. Petitioner further claims that he was denied his Sixth Amendment right to counsel when the trial court allowed the rap lyrics seized for the purpose of the Lemon/Terry/Washington case to be used against him in the Luckey case at trial.

On December 19, 2001, petitioner moved to suppress all evidence seized from his cell at the Santa Rita Jail. Petitioner argued that after counsel had been appointed to defend him in the Luckey matter, police interrogated him regarding the Lemon/Washington/Terry incident without consulting with his counsel. The interrogation resulted in petitioner's admission that he was a rap lyricist and the consequent seizure of the rap lyrics at issue from petitioner's jail cell. Petitioner contends that this violated the rule of Massiah v. United States, 377 U.S. 201, 205-206 (1964). The trial court denied petitioner's motion, reasoning that under Texas v. Cobb, 532 U.S. 162, 167-68 (2001), the police have a right to interrogate a defendant about an incident, even if defense counsel has only been appointed to defend charges stemming from an unrelated incident. Petitioner then moved to suppress the seized rap lyrics from being considered with respect to the Luckey charges. The trial court requested that petitioner's counsel identify any case law in support of his argument. The record does not reflect, however, that any case law

was presented or that any additional arguments were heard on this issue.

### 1.   **Massiah** **Violation**

Once a defendant's Sixth Amendment right to counsel has attached, the government may not deliberately elicit incriminating statements from the defendant outside the presence of counsel.  Massiah, 377 U.S. at 206.  A defendant's statements regarding offenses for which he has not been charged, however, are admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses.  Cobb, 532 U.S. at 167-68.  "[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities."  Maine v. Moulton, 474 U.S. 159, 179-180 (1980).

The state court reasonably found no Massiah violation under the rationale of Cobb.  See 28 U.S.C. § 2254(d).  During the police interrogation on May 15, 2001, Sergeant Ferguson made clear that he did not want to discuss the Luckey incident.  Instead, he sought information on the Lemon/Washington/Terry matter, an incident for which petitioner had not been charged and for which the Sixth Amendment right to counsel had not yet attached.  Cf. Cobb, 532 U.S. at 167-68. Petitioner is not entitled to federal habeas relief on this claim

### 2.   **Admissibility**

Petitioner claims that even if the police had a right to interrogate him on the Lemon/Washingtion/Terry incident under the rationale of Cobb, any evidence seized as a result of that interrogation should not have been admitted in regards to the Luckey incident.

Petitioner frames his admission of evidence claim as a violation of his Sixth

Amendment right to counsel.  But because he was represented by counsel when the evidence was admitted against him at trial, the claim at most implicates his due process rights.

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991).  Accordingly, a federal court cannot disturb on due process grounds a state court's decision to admit evidence unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).

"Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions."  Jammal, 926 F.2d at 920 (footnote omitted).  Only if there are no permissible inferences the jury may draw from the challenged evidence can its admission violate due process.  Id.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  Id. (citation and internal quotation marks omitted).

In order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993).  The court must find that the error had "'a substantial and injurious effect' on the verdict."  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

The state court's rejection of the claim cannot be said to be contrary to, or

an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d). The admission of petitioner's rap lyrics was not so prejudicial or arbitrary as to render his trial fundamentally unfair.  There were clear and permissible inferences a jury could draw from the evidence with respect to petitioner's involvement in the Lemon/Washington/Terry incident as well as the Luckey incident.  See Jammal, 926 F.2d at 920.  And even if there was error, it was not prejudicial under Brecht. The eyewitness identifications and substantial evidence presented at trial overwhelmingly supported the prosecution's case.  Petitioner is not entitled to federal habeas relief on grounds that the trial court denied his motion to suppress rap lyrics seized from his jail cell.

### G.    Prosecutorial Misconduct

Petitioner claims that the prosecution committed misconduct when it: (1) introduced facts to the jury not in evidence; and (2) introduced illegally obtained letters written by petitioner.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  Darden v Wainwright, 477 U.S. 168, 181 (1986); see Smith v Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").  To warrant habeas relief on the basis of a prosecutorial misconduct, the misconduct must have amounted to a violation of due process and have had a substantial and injurious effect or influence in determining the jury's verdict.  See Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (citing Brecht v Abrahamson, 507 U.S. 619, 637 (1993)).

### 1.      Prosecutorial Misconduct in Closing Arguments

Petitioner claims that the prosecutor committed misconduct when facts not in evidence were introduced during closing arguments.  Petitioner cites the following two statements made by the prosecutor:

> Remember, he's staying with Heavy.[1] He's friends with Heavy when he goes on this long car chase. He says, let me put my car at my brother's house, Heavy D. So all of this attempt to make Heavy D the shooter, disassociate himself from Heavy D because that's the bad person, except that is the defendant's friend.

RT 1088.

> The Defense would like you to believe there's some kind of conspiracy. They are doing all of this to protect Heavy D for whatever reason, even though there's more evidence that in fact the defendant is doing this because or did this crime in order to assassinate the foe of Heavy D since Heavy D is his friend. Since Heavy D is the one who he's going to stay with in order to protect himself while the police are looking for him.

RT 1090

Petitioner contends that the prosecutor made these statements with knowledge that the car in which petitioner was arrested had no involvement in the Lemon/Washington/Terry shootings.  Petitioner further contends that the prosecution erroneously used the relationship between Cummins and petitioner as a motive for the Lemon/Washington/Terry shootings.

The prosecution's comments during closing argument did not constitute prosecutorial misconduct.  Petitioner testified at trial that Derrick Cummins was his friend.  See RT 907.  Petitioner's claim that his relationship with Cummins was a fact not in evidence is baseless.  So is petitioner's claim that the prosecution was fully aware that the car in which petitioner was arrested had no involvement in the Lemon/Washington/Terry shootings.  The prosecution was clearly emphasizing the admitted friendship between Cummins and petitioner so that the jury could make

---

[1]Petitioner stipulates that "Heavy-D" refers to Derrick Cummins.  Petn. at 110 n.1.

1  its own inferences from the evidence.  See Fields v. Brown, 431 F.3d 1186, 1206

2  (9th Cir. 2005) (attorneys given wide latitude in closing arguments and entitled to

3  argue reasonable inferences from the evidence).

4       Even if the prosecution had committed prosecutorial misconduct, petitioner

5  would not be entitled to federal habeas relief because it cannot be said that the

6  "error" had a substantial and injurious effect on the jury's verdict.  See Brecht, 507

7  U.S. at 637.  Petitioner's testimony at trial that Cummins was his friend negated

8  any actual harm that would have flowed from the prosecutor's statements during

9  closing arguments.  Moreover, the eyewitness identifications and substantial

10  evidence presented at trial overwhelmingly supported the prosecution's case as to

11  both incidents.

12       Petitioner is not entitled to federal habeas relief on grounds that the

13  prosecution committed prosecutorial misconduct by introducing facts not in

14  evidence during closing arguments.  The state court's rejection of the claim cannot

15  be said to be contrary to, or an unreasonable application of, clearly established

16  Supreme Court precedent, or be based on an unreasonable determination of the

17  facts.  See 28 U.S.C. § 2254(d).

### 2.     Prosecutorial Misconduct in Introducing Letters

19       Petitioner claims that the prosecution committed misconduct when it

20  illegally seized petitioner's outgoing mail without a search warrant or court order

21  and then introduced the letters into evidence.  Petitioner further claims that the

22  illegal seizure violated his Fourth Amendment right to privacy.

### a.     Fourth Amendment

24       Stone v. Powell, 428 U.S. 465, 481-82, 494 (1976), bars federal habeas

25  review of Fourth Amendment claims unless the state did not provide an

26  opportunity for full and fair litigation of those claims.  Even if the state courts'

determination of the Fourth Amendment issues is improper, it will not be remedied in federal habeas corpus actions so long as the petitioner was provided a full and fair opportunity to litigate the issue.  See  Locks v. Sumner, 703 F.2d 403, 408 (9th Cir. 1983).  All Stone v. Powell requires is the initial opportunity for a fair hearing. Such an opportunity for a fair hearing forecloses this court's inquiry upon habeas petition into the trial court's subsequent course of action, including whether or not the trial court made any express findings of fact.  See Caldwell v. Cupp, 781 F.2d 714, 715 (9th Cir. 1986).  The existence of a state procedure allowing an opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's actual use of those procedures, bars federal habeas consideration of those claims.  See Gordon v. Duran, 895 F.2d 610, 613-14 (9th Cir. 1990) (whether or not defendant litigated 4th Amendment claim in state court is irrelevant if he had opportunity to do so under California law).

Petitioner's Fourth Amendment claim is barred by Stone v. Powell.  The record reflects that petitioner had an opportunity to litigate his Fourth Amendment claim, but instead, argued that the letters were inadmissible for lack of foundation. The objection was raised again at a later time on Fourth Amendment grounds and the trial court overruled the objection as untimely.  He cannot now raise the claim in federal court.  See Gordon, 895 F.2d at 613-14.

### b.    Prosecutorial Misconduct

Petitioner's prosecutorial misconduct claim based on the allegedly illegal seizure of petitioner's letters is without merit because the record makes clear that the prosecution sought and obtained the trial court's approval before introducing the letters into evidence.  But even if the letters were improperly introduced into evidence, petitioner would not be entitled to federal habeas relief because it cannot be said that the "error" had a substantial and injurious effect on the jury's verdict.

See Brecht, 507 U.S. at 637.  The eyewitness identifications and substantial evidence presented at trial overwhelmingly supported the prosecution's case against petitioner.

Petitioner is not entitled to federal habeas relief on grounds that the prosecution introduced illegally seized letters into evidence.  The state court's rejection of the claim cannot be said to be contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or be based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

### H.    Victim Photographs Improperly Shown to Jury

Petitioner claims that the trial court committed prejudicial error by allowing the prosecution to display inflammatory photographs of the victims during closing arguments.

Petitioner's claim is without merit because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)).  But even under the Ninth Circuit's more generous precedent it cannot be said that the victim photographs in this case rendered petitioner's trial fundamentally unfair.  Cf. Gerlaush v. Stewart, 129 F.3d 1027, 1032 (9th Cir. 1997) (admission of "gruesome" photographs of victim does not raise "spectre of fundamental unfairness").

Petitioner also claims that the prosecutor committed prosecutorial misconduct during closing arguments by misstating the testimony of Sharon Van Meter, who performed the autopsy on Dormon Lemon.

42

Van Meter's testimony was as follows:

> Generally, with handguns, the other materials that exit the muzzle of the gun with the bullet, the smoke, the powder that causes stippling, will not reach the body beyond that 18 to 24 inches. They fall off into the atmosphere.

> So, if there is stippling, then the gun was somewhat closer than 18 to 24 inches. Once must always fire the same weapon with the same ammunition to get a more precise view of exactly what the distance might be.

RT 577.

The prosecutor's testimony was as follows:

> [Petitioner's counsel] also talked about the stippling and he kind of presented it like I made it up, 16 to 18 inches. Well, in fact Sharon Van Meter said that you would expect to see stippling if the weapon was 18 to 24 inches away. Didn't pull it out of nowhere or just make it up. It's right there in the record.

RT 1087.

The "misstatement" petitioner complains of did not render his trial fundamentally unfair because it basically conformed to Van Meter's testimony that generally the presence of stippling means the gun was somewhat closer than 18 to 24 inches. See Darden v. Wainwright, 477 U.S. 168, 181 (1989) (prosecutor's misconduct violates due process if it renders defendant's trial fundamentally unfair). And in view of the substantial evidence of guilt presented at trial, it certainly cannot be said that the "misstatement" had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 637.

Petitioner is not entitled to federal habeas relief on his claim that he was denied due process when, during closing argument, the prosecutor displayed photographs of the victims and misstated the testimony of Van Meter. The state court's rejection of the claim was not contrary to, or involved an unreasonable application of clearly established Supreme Court precedent, or was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

1

## I.   <u>Admission of Illegally Intercepted Phone Calls</u>

2          Petitioner claims that the trial court committed prejudicial error when it

3  allowed illegally intercepted phone calls made by petitioner to be introduced into

4  evidence, thus violating his due process rights.  Petitioner argues that none of the

5  procedures followed in obtaining his phone calls conformed with the federal

6  wiretapping statute.

7          The federal wiretapping statute, Title III of the Omnibus Crime Control and

8  Safe Streets Act of 1968, 18 U.S.C. §§ 2510, <u>et seq.</u> (1976) ("the Act"), applies to

9  intercepted communications used against defendants in state court.  <u>See</u> <u>Llamas-</u>

10  <u>Almaguer v. Wainwright</u>, 666 F.2d 191, 193-94 (5th Cir. 1982); <u>Hussong v.</u>

11  <u>Warden</u>, 623 F.2d 1185, 1187-91 (7th Cir. 1980).  But there is no clearly

12  established Supreme Court precedent holding that a violation of the Act may result

13  in a due process claim cognizable in federal habeas corpus.  <u>See</u> 28 U.S.C. §

14  2254(d).

15          Even if the phone calls were intercepted illegally and used against petitioner

16  in such a way as to deny him due process, petitioner would not be entitled to

17  federal habeas relief because it cannot be said that the "error" had a substantial and

18  injurious effect on the jury's verdict.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637.  The eyewitness

19  identifications and other substantial evidence presented at trial overwhelmingly

20  supported the prosecution's case against petitioner.

21          Petitioner is not entitled to federal habeas relief on his claim that the trial

22  court allowed illegally intercepted phone calls to be introduced into evidence at

23  trial.  The state court's rejection of the claim cannot be said to be contrary to, or an

24  unreasonable application of, clearly established Supreme Court precedent, or be

25  based on an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).

26

27

28

1

## CONCLUSION

2       For the foregoing reasons, the petition for a writ of habeas corpus is

3 DENIED.

4       The clerk shall enter judgment in favor of respondent and close the file.

5 SO ORDERED.

6 DATED:  November 17, 2009

7                                              CHARLES R. BREYER
                                               United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

G:\PRO-SE\CRB\HC.06\Key1.merits.wpd

27

28                                              45